# United States Court of Appeals
## For the First Circuit

No. 10-1787

MEDELICIA VELAZQUEZ-ORTIZ,

Plaintiff, Appellant,

v.

THOMAS J. VILSACK,
Secretary of the Department of Agriculture,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Torruella, Selya, and Lipez,
Circuit Judges.

Elaine Rodriguez-Frank for appellant.
Irene M. Solet, Attorney, Appellate Staff, Civil Division,
Department of Justice, with whom Tony West, Assistant Attorney
General, Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Marleigh D. Dover, Attorney, Appellate Staff, Civil Division,
Department of Justice, were on brief, for appellee.

September 22, 2011

**LIPEZ, <u>Circuit Judge</u>.** Medelicia Velazquez-Ortiz ("Velazquez") sued her employer, the Secretary of the United States Department of Agriculture ("USDA"), claiming to be the victim of discrimination based on her age and gender, and retaliation for having complained about discrimination in the past. The district court entered summary judgment against her, and we affirm.

I.

## A. Factual Background

We recite the facts, as supported by the record, in the light most favorable to Velazquez, and draw all reasonable inferences in her favor. <u>Ahern</u> v. <u>Shinseki</u>, 629 F.3d 49, 51 (1st Cir. 2010).

Velazquez began working for the USDA in 1977, at the age of 23. For approximately eighteen years, she was employed as a County Office Assistant in the field office located in Humacao, Puerto Rico. That position was initially classified as grade level 3 ("GS-3") and, a few years later, as GS-4 and then GS-5. In February 1995, Velazquez became a Community Development Technician, a GS-6 position. After that position was eliminated, in 1997, she accepted a part-time, GS-7 Community Development Technician job. She remained in that role, later formally denominated as Rural Development Technician, until she filed the underlying complaint with the USDA. At the time she commenced federal litigation, she

-2-

was employed in the Caguas office as an Area Technician, classified as GS-7.[1]

Throughout Velazquez's three decades at the USDA, she has applied for a number of promotions and been rejected on several occasions. Perceiving two such rejections, as well as other alleged mistreatment by USDA officials, as acts of discrimination and retaliation, Velazquez filed four Equal Employment Opportunity ("EEO") complaints and one informal grievance. Because two of her EEO complaints and the informal grievance play a central role in this appeal, we discuss them in detail below.[2]

1. 1996 Application and Subsequent EEO Activity

In late 1996, after receiving notice that her full-time position was going to be eliminated, Velazquez applied for a GS-7 Community Development Specialist position. A committee composed of Andres Irizarry, Wilson Almodovar, and Pedro Gómez, the Rural Housing Program Director, reviewed the applications. They recommended that the State Rural Development Director, Ileana Echegoyen, appoint Edwin Delgado to the job. Almodovar, who had

_____

[1] In October 2007, the Humacao office of the USDA was closed and most of the employees, including Velazquez, were transferred to Caguas.

[2] The record does not reveal the details of the other two complaints, except that one was filed in 1996 as part of a nationwide class action dispute alleging sex-based discrimination, and the other in 1997 taking issue with her adjustment to part-time status. In addition to having been an EEO complainant, Velazquez has served on the local USDA Equal Employment Advisory Committee.

been the supervisor in Humacao for some time, emphasized the need to select someone from outside the office because the current employees "were not working as a team." The committee understood that the Humacao office, with one of the largest and most complex caseloads in the Commonwealth at that time, had a high loan delinquency rate. As Gómez later stated, the committee thought that Delgado, who had worked at the USDA for many years but was not then in Humacao, "would bring new ideas from the place he had been working and he would motivate the people of the local office."[3] In a document submitted to Echegoyen, the committee members stated that they were recommending Delgado for a number of reasons, including that he fulfilled the need for "new blood." Echegoyen followed the recommendation and appointed Delgado.

In March 1997, after learning that she had not been selected, Velazquez filed an EEO complaint, alleging that the failure to offer her the GS-7 Community Development Specialist position constituted illegal gender-based discrimination and retaliation -- presumably for her participation in a 1996 class action against the USDA alleging sex-based discrimination. The USDA investigated the 1997 complaint in 1998. The affidavits of Almodovar, Gómez, and Echegoyen prepared at that time are part of the summary judgment record in this case. The investigation of

_____

[3] This expectation was fulfilled, to some degree: once Delgado began working in Humacao, the office's delinquency rate declined between five and seven percentage points.

-4-

that case and the subsequent appeal to the United States Equal Employment Commission ("EEOC") concluded in 2000; the record does not reveal the outcome.

2. 2003 Informal Grievance

In April 2003, James Rivas, a former coworker of Velazquez, became the supervisor of the Humacao office. In that role, Rivas oversaw Velazquez's work. On several occasions, he criticized Velazquez in front of her coworkers and family members, making threats and insinuations such as, "You need to justify your salary in this [o]ffice," and, "Management may decide to close [this] [o]ffice . . . if the management and program's goals are not reached." Rivas also distributed work unfairly and refused to allow Velazquez to follow a flexible work schedule in order to care for her parents. The acrimony between Velazquez and Rivas came to a head on June 24, when an interaction between the two caused Velazquez to suffer physical and emotional problems requiring her to take a seven-month leave of absence and seek medical and psychological aid.

On July 7, 2003, she filed an informal grievance with her union, the American Federation of Government Employees Local 055.[4]

_____

[4] Unlike an EEO complaint, Velazquez's informal grievance was not submitted on an official form that she completed with relevant details about Rivas's actions. Rather, it appears to be a five-page typed letter, the subject of which is "Informal Grievance Against Mr. James Rivas, CDM." The letter is addressed to the president of Velazquez's local union branch, with a copy sent to William Montero, the Chief of Administrative Programs in the USDA

-5-

In addition to setting forth the events described above, Velazquez alleged that Rivas acted aggressively, impulsively, and nervously, and that she felt intimidated, harassed, confused, and anxious. She also accused him of being "violent," apparently referring to verbal, not physical, violence. She did not explicitly accuse Rivas of age- or sex-based discrimination or retaliation for previous EEO activity, but she twice referred to herself as Rivas's "female" coworker.

The record does not reveal what became of the grievance. By the time that Velazquez returned to work in January 2004, Rivas had been transferred to another office. Velazquez did not file a complaint with the USDA but she gave notice of the grievance to Jose Otero-Garcia ("Otero"), who had taken over as State Director from Echegoyen.

### 3. 2003 Application and Subsequent EEO Activity

#### a. Application Process

Velazquez submitted another application for promotion in 2003. After two Loan Specialist openings in Humacao were announced, Velazquez applied for consideration at the GS-9 level. A panel composed of Maria de Jesus, Myrna Calero, and Pedro Gómez evaluated the applications. Because so many qualified individuals had applied, the panel determined that a round of interviews was necessary. Gómez, along with human resources manager Sylma Vargas

---

Office of Rural Development in San Juan.

Ibarra ("Vargas"), conducted those interviews in January or February of 2004.[5]

In making their recommendation, Gómez and Vargas considered the applicants' ability in three areas: knowledge of lending practices within the USDA and the mortgage industry, leadership, and oral and written communication skills. They gave the interview "a lot of weight." Gómez and Vargas considered Velazquez one of the "best qualified candidates," who, despite a lack of experience in the mortgage industry as a whole, had demonstrable knowledge of USDA lending practices. She was able to express herself well in writing.

Despite their favorable impression of Velazquez, Gómez and Vargas decided to recommend Angel Bruno and Nancy Planas for the positions, the first at the GS-9 level and the second at GS-5. Bruno was a USDA employee who "did exceptionally well during the interview" and had better oral communication skills than Velazquez. Planas, on the other hand, had worked only with the Internal Revenue Service. Both nominees were in their early forties, while Velazquez was forty-nine. State Director Otero followed the recommendations and appointed Bruno and Planas.

---

[5] In her deposition in this case, Velazquez stated that she was interviewed in January. In the affidavit she completed as part of the EEO investigation, she stated that she was interviewed on February 6.

                b. EEO Complaint, Agency Investigation, and Appeal

        After receiving notice in March 2004 that she was not selected, Velazquez filed with the USDA the EEO complaint that led to this appeal.  The complaint form asked her to list the bases of alleged discrimination, to which she responded "Age, Reprisal."  In her two-paragraph description of the "Issue(s) of Alleged Discriminat[ion]" she faced, Velazquez wrote that she was not selected for the GS-9 position "due all or in part because of my age and [r]eprisal for previously filing EEO [c]omplaint [sic]."  She explained that two positions were open, one of which "was filled by a male and the other with a lady . . . . Both look younger than I."  Velazquez also recounted her 1996 application and subsequent EEO complaint for sex-based discrimination, her participation in the class action, and her grievance alleging "mistreatment and work harassment" at the hands of Rivas.

        The Employment Complaints Division of the Office of Civil Rights within the USDA sent Velazquez a letter acknowledging receipt of her complaint.  The letter articulated her claim as: "Whether the agency subjected [Velazquez] to harassment based on her age (over 40) and reprisal (prior EEO activity) when she was not selected for the position of Loan Specialist . . . ."  It then informed her that if she wished to make any statement concerning the characterization of her claim, she had to do so within seven days of receiving the letter.  She did not send such a statement.

With the investigation proceeding, the agency's investigator obtained sworn affidavits from Velazquez, Gómez, and Vargas in October 2004. Gómez discussed his role in the 2004 selection process, said that he "definitely [did] not" discriminate against Velazquez, and in fact was not aware of her age or "any prior involvement in the EEO process." Similarly, Vargas explained her role in the interviews and selection, including choosing Bruno because he "was working towards finishing an MBA." Vargas confirmed that she did not discriminate against Velazquez and did not know her age or EEO history.

Velazquez, in turn, spelled out her perceived injuries and the bases for her belief that her qualifications were superior to those of Edwin Delgado in 1997 and Angel Bruno in 2004. She put particular emphasis on Almodovar's statement that the Humacao office needed "new blood" in 1997. She also argued that Gómez "certainly was aware" of her prior EEO activity because he was interviewed in 1998 during the investigation of her 1997 complaint. Velazquez also noted that Vargas was incorrect about Bruno's educational background: he had taken courses at the Mortgage Bankers School, but had not taken any course in pursuit of a Master of Business Administration degree.[6]

---

[6] From the USDA's final decision, it appears that the investigation yielded at least one affidavit, as well as some additional documentation and a written report of the investigation, that are not reproduced in the record. The record does include the affidavit of Francisco Soto-Rodríguez, a former Loan Specialist and

A report of investigation was issued in January 2005. The USDA Office of Adjudication and Compliance issued a final decision on August 15, 2007, finding against Velazquez on both her reprisal and age discrimination claims. With respect to the first, the agency credited Gómez's and Vargas's statements that they did not know of Velazquez's EEO history and found that, regardless, the six-year gap between the investigation of her previous EEO complaint and her 2004 rejection was too large to show that the former had motivated the latter. Regarding her age discrimination claim, the agency found that Velazquez established a prima facie case of discrimination but failed to show that the proffered reasons for choosing Bruno were pretextual.

Velazquez appealed to the EEOC, which issued its decision on January 28, 2008. The EEOC assumed, for the sake of argument, that Velazquez had established a prima facie case of both discrimination on the basis of age and reprisal, but found that Velazquez had "failed to provide sufficient evidence of pretext or that she has superior qualifications." Velazquez requested that

coworker of Velazquez. Soto-Rodríguez stated that he believed Velazquez was better qualified for the GS-9 position than Bruno, and he claimed to "know that Management takes into consideration the age of candidates." The district court rejected this piece of evidence because the affiant did not explain how he reached his conclusions or reveal the basis for his knowledge. Apparently conceding the point, Velazquez does not, on appeal, refer to Soto-Rodríguez or his statement.

the EEOC reconsider its decision, but her request was denied.  She turned next to the federal courts.

**B. Procedural History**

In July 2008, Velazquez filed her federal court complaint against the Secretary of the USDA,[7] alleging that she suffered discrimination on the basis of sex and age, as well as retaliation for her earlier EEO complaints.  The defendant moved for summary judgment on all claims, which the district court granted.  The court held that Velazquez's 2004 EEO complaint did not allege sex discrimination, and thus she had failed to exhaust administrative remedies, barring that claim.  The court also held that Velazquez had failed to show that she would have been selected for promotion in 2004 but for her age, pointing out that her only evidence was the 1997 memo referencing "new blood" and Soto-Rodríguez's statement that he knew that management officials took age into account in considering candidates.  Finally, the court determined that her only evidence of retaliation was that Gómez acknowledged, in 1998, that he knew of her work with the EEO Advisory Committee. Finding that evidence insufficient, the court went on to hold that the passage of six years between the 1998 EEO investigation and the

---

[7] Velazquez filed her complaint against Michael Johanns, a former secretary of the USDA.  At some point Thomas Vilsack, the appellant, was substituted for Johanns, in accordance with Federal Rule of Civil Procedure 25(d).

-11-

2004 denial of her application for the GS-9 position precluded an inference that the latter was caused by the former.

Velazquez timely appealed. She argues that she did, in fact, raise her sex discrimination complaint in her 2004 EEO filing, and thus the required administrative remedies were exhausted. She also contends that the record contains sufficient proof of age discrimination and retaliation to avoid summary judgment, and that the time span relevant to her retaliation claim is between her 2003 complaint against Rivas and her 2004 rejection from the GS-9 position.

**II.**

We review the district court's entry of summary judgment de novo and affirm if the record, viewed in the light most favorable to the appellant, reveals no genuine issue of material fact and demonstrates that the movant is entitled to judgment as a matter of law. Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011). Although the appellant is entitled to the benefit of all reasonable inferences, she cannot defeat summary judgment with "conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation." Id.

**A. Title VII**

1. Sex-Based Discrimination

Under Title VII of the Civil Rights Act of 1964, "personnel actions affecting employees . . . in executive agencies

-12-

. . . shall be made free from any discrimination based on . . . sex . . . ."  42 U.S.C. § 2000e-16(a).  A federal employee claiming such discrimination may sue in federal court, but must first "seek relief in the agency that has allegedly discriminated against him."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 832 (1976); see also Vera v. McHugh, 622 F.3d 17, 29 (1st Cir. 2010); 42 U.S.C. § 2000e-16(c).  Having exhausted that administrative remedy, the complainant may, within a certain time period, either appeal to the EEOC and then file a complaint with a federal district court or immediately file in court.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407.  With limited exceptions not relevant here, "failure to exhaust th[e] administrative process 'bars the courthouse door.'"  Franceschi v. U.S. Dep't of Veterans Affairs, 514 F.3d 81, 85 (1st Cir. 2008) (quoting Bonilla v. Muebles J.J. Álvarez, Inc., 194 F.3d 275, 278 (1st Cir. 1999)).

Pursuant to its rulemaking authority, see 42 U.S.C. § 2000e-16(b), the EEOC has promulgated regulations encompassing "a highly structured set of steps which must be taken by the agency and the aggrieved party as the complaint process proceeds."  Vera, 622 F.3d at 29.  This process requires the complainant to, among other things, file a complaint with the relevant agency.  29 C.F.R. § 1614.106(a).  The complaint must contain a statement "describ[ing] generally the action(s) or practice(s) that form the basis of the complaint."  Id. § 1614.106(c).

-13-

The fact that a complainant has filed an EEO complaint does not open the courthouse door to all claims of discrimination. Rather, the scope of the federal court complaint is constrained by the allegations made in the administrative complaint: the former must "bear some close relation" to the latter. Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005). The language used in the complaint need not "presage with literary exactitude the judicial pleadings which may follow." Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 32 (1st Cir. 2009) (quoting Davis v. Lucent Techs., Inc., 251 F.3d 227, 233 (1st Cir. 2001)). But, in order to serve the purposes of the administrative exhaustion requirement -- prompt notice to the agency and an opportunity for early resolution, Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996) -- "the factual statement in [the] written charge should have alerted the agency to [the] alternative basis of discrimination" that the plaintiff raises for the first time in court. Thornton, 587 F.3d at 32 (quoting Davis, 251 F.3d at 233) (first alteration in original).

Finding that Velazquez's 2004 EEO complaint did not claim sex as a basis of the alleged discrimination, the district court dismissed the claim for failure to exhaust administrative remedies. On appeal, Velazquez contends that the complaint referred generally to sex-based discrimination, satisfying the burden of alerting the USDA to the nature of her allegations. She points to the fact that

-14-

she described her prior EEO complaints, and that they had alleged sex-based discrimination.  She also contends that her mention of the 2003 informal grievance was an allegation of discrimination based on sex.

While it is true that Velazquez's prior EEO complaints set forth allegations of discrimination on the basis of sex, her reference to those complaints was plainly in support of her new allegation of reprisal.  That is also the case with the reference to her 2003 grievance.  To the extent Velazquez was seeking redress in 2004 for the perceived sex-based discrimination that gave rise to her prior EEO complaints or the 2003 grievance, including her rejection from the GS-7 position and Rivas's harassment, such a claim was time-barred.  See 29 C.F.R. §§ 1614.105(a) & (d), 1614.106(b) (requiring initial contact with Counselor, notice of right to sue, and filing of EEO complaint within ninety days of date of discriminatory action).

Moreover, her insistence that she intended to raise her gender as a basis for discrimination is belied by the fact that, after the agency and the EEOC construed her complaint as alleging only age-based discrimination and retaliation, Velazquez never took advantage of her opportunities to disabuse them of that perception. The USDA stated that it would investigate her claims of "harassment based on . . . age (over 40) and reprisal (prior EEO activity)" and then invited her to clarify any inaccuracies in this description.

-15-

The agency and the EEOC both issued decisions addressing only these two bases for discrimination. Although she requested reconsideration of the EEOC's decision, she did not contend that the decision neglected to address one of her purported claims.

In sum, the district court did not err in dismissing Velazquez's claim of sex-based discrimination. Having failed to raise such a claim or anything close to it in her 1997 EEO complaint, she did not exhaust the required administrative remedies.

2. Retaliation

Velazquez's Title VII retaliation claim does not suffer from the same procedural infirmity. In complaining about her rejection from the GS-9 position in 2004, she explicitly alleged that it was based on "[r]eprisal" for filing her 1997 EEO complaint and her 2003 informal grievance.

As applicable to the private sector, Title VII expressly forbids not only direct discrimination, but also retaliation against an individual who has complained about discriminatory employment practices. Ahern, 629 F.3d at 55; see also 42 U.S.C. § 2000e-3(a). Although the statute contains no parallel prohibition applicable to the federal sector, this circuit and others have held that various provisions of Title VII operate, either alone or in concert, to the same effect. See, e.g., Calhoun v. Johnson, 632 F.3d 1259, 1261 (D.C. Cir. 2011); Bonds v. Leavitt, 629 F.3d 369,

-16-

384 (4th Cir. 2011); Morales-Vallellanes v. Potter, 605 F.3d 27, 35-36 (1st Cir. 2010); Dossa v. Wynne, 529 F.3d 911, 915 (10th Cir. 2008).

In order to establish a prima facie case of retaliation, a plaintiff must show that she "engaged in protected activity," that she was the subject of an adverse employment action, and that the action was causally linked to her involvement in the protected activity. Ahern, 629 F.3d at 55. Where the evidence shows only that the decisionmaker knew of the complainant's protected conduct at the time the adverse employment action was taken, causation may be inferred from a very close temporal relationship between the protected activity and the adverse action. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004). Periods of three or four months have been held to be insufficient to support such an inference. Calero-Cerezo, 355 F.3d at 25.

The district court found Velazquez's evidence of causation lacking. It found that the only such evidence was Gómez's May 1998 statement that he knew Velazquez was a "very active member" of the EEO Advisory Committee. It then explained that it would not draw an inference of causation based on temporal proximity because Velazquez's previous EEO complaint was investigated in May 1998 and the rejection relevant to the current EEO complaint occurred in March 2004, years beyond the length of

-17-

time typically considered sufficient to establish such an inference.

On appeal, Velazquez argues that there is evidence of causation because of the involvement of Pedro Gómez in evaluating her 1997 and 2003 job applications, as well as his participation, as a witness, in the investigation of her 1997 EEO complaint. She also contends that the relevant time gap, for purposes of raising an inference of causation, is between her 2003 informal grievance and her 2004 rejection.

Neither argument is persuasive. Gómez's involvement in the tribulations of Velazquez's employment with the USDA, and his knowledge of her participation on the EEO Advisory Committee, alone, do not suggest that his recommendation of Angel Bruno was caused by Velazquez's EEO activity. See King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997) (holding no causation where plaintiff showed only that he complained to supervisor and was disciplined five months later by same person). His presence, without more, suggests that the events were related only by virtue of having a similar cast of characters. This is proof only of the fact that the "decisionmaker knew of the plaintiff's protected conduct when he . . . decided to take the adverse employment action." Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 85 (1st Cir. 2006).

If Gómez's ongoing involvement in Velazquez's employment issues had been closer in time to his recommendation, in 2004, that Otero offer the GS-9 position to Bruno, Velazquez would have come closer to establishing a prima facie case of retaliation. See id. Here, the events were separated by years: Gómez was involved in Velazquez's prior application for a promotion and the subsequent EEO complaint, the investigation of which concluded in 2000; his recommendation to Otero was made in 2004. The passage of this length of time, coupled with evidence of mere knowledge, makes any inference of causation unreasonable.

Velazquez also suggests that the relevant time period is the approximately eight months between her July 2003 informal grievance against Rivas and the March 2004 rejection of her application for a promotion. There is no evidence that Gómez or Vargas knew about the informal grievance, however, and thus their selection of Bruno over Velazquez could not have been caused by a desire to retaliate against her for filing that 2003 grievance.[8] Thus, dismissal of Velazquez's retaliation claim was proper.

---

[8] There is evidence that Otero knew about Velazquez's 2003 grievance, and Otero made the ultimate decision to hire Bruno rather than Velazquez. Even with respect to Otero, however, the record shows only knowledge coupled with a temporal gap of over eight months. That is insufficient to raise an inference of a causal connection. See Calero-Cerezo, 355 F.3d at 25.

**B. Age Discrimination in Employment Act**

      1. Burden of Proof

      The Age Discrimination in Employment Act ("ADEA") makes it unlawful for certain federal employers to discriminate based on age when making any "personnel actions affecting employees . . . who are at least 40 years of age." 29 U.S.C. § 633a(a). Taking the parties' lead, we bypass the burden-shifting framework, see Gómez-González v. Rural Opportunities, Inc., 626 F.3d 654, 662 (1st Cir. 2010) (permitting this approach on summary judgment), but pause briefly to discuss the burden of proof applicable to the claim of discrimination.

      In her reply brief, Velazquez raises the question of the burden of proof for the first time. Below, the district court relied upon Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343 (2009), in requiring Velazquez to establish, for the purpose of surviving summary judgment, that her age was the "but for" cause of the defendant's decision not to promote her. In Gross, the Supreme Court held that, under the private-sector anti-discrimination provision of the ADEA, the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." Id. at 2351. Because the Court's reasoning rested heavily upon the statutory language, however, and the critical phrase in the private sector provision is not reproduced in the federal sector provision,

-20-

Velazquez argues that Gross is not controlling.[9]  See Ford v. Mabus, 629 F.3d 198, 204-06 (D.C. Cir. 2010) (holding that Gross is inapplicable to federal sector provision and retaining requirement that plaintiff show age was "a factor in the challenged personnel action").

Velazquez did not raise the burden of proof issue below or in her opening appellate brief.  In fact, the only case that Velazquez cited in her initial brief to support her age discrimination claim was Mesnick v. General Electric Co., 950 F.2d 816 (1st Cir. 1991), which involved a private employer and applied the "but for" standard.  After the Secretary, in an abundance of caution, briefed the issue, Velazquez apparently recognized the omission and addressed the argument in her reply brief.  As it was not raised below or in her initial brief, the argument is either forfeited or, as it would be under some circumstances, waived.  See Igartúa v. United States, 626 F.3d 592, 603 (1st Cir. 2010).  Assuming that it is only forfeited, the test is plain error.  Id.

In all events, we need not reach the issue because, even under the less rigorous "mixed motive" burden for which Velazquez

---

[9] The private sector provision reads: "It shall be unlawful for an employer . . . [to] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1) (emphasis added).  By contrast, the federal sector provision reads: "All personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age."  Id. § 633a(a) (emphasis added).

-21-

advocates, she cannot overcome summary judgment on her age discrimination claim. Under the mixed motive framework, a plaintiff must show that the adverse employment action she suffered "was caused at least in part by a forbidden type of bias." Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003).

2. Velazquez's Arguments

Velazquez marshals two main sets of facts to show that age was a motivating factor in the decision to promote Bruno over her. She relies heavily upon the "new blood" memorandum, suggesting that it refers to a desire to hire younger individuals. She also contends that she was better qualified for the GS-9 position than Angel Bruno.[10] In that vein, she emphasizes that, contrary to what Vargas said to the EEO investigator, Bruno was not studying for an MBA.[11]

---

[10] Velazquez also mentions that she was the second highest ranked candidate for the GS-9 position. This assertion is based on a piece of evidence that was not submitted to the trial court. The document is not part of the record on appeal, see Fed. R. App. P. 10(a), and thus we disregard it, see Naser Jewelers, Inc. v. City of Concord, 538 F.3d 17, 19 n.1 (1st Cir. 2008).

[11] Velazquez also argues that she was misled because the agency decided, without informing the applicants, that the two Humacao positions would be filled at the GS-5 and GS-9 levels and that the candidates' English language skills would be given some weight in the selection process. The record reflects that these determinations were made before the interviews and were not divulged to any of the candidates. It is not apparent how these decisions could disadvantage Velazquez in relation to the younger candidates. Nor can we discern their relevance to the issue of whether age was a motivating factor in the hiring decision.

Although we do consider the facts of the case "as part of an aggregate package of proof offered by the plaintiff," rather than examining each piece "in splendid isolation," Mesnick, 950 F.2d at 824, we think it is useful here to discuss the value of each piece of evidence in turn before reaching our final conclusion.

a. "New Blood"

Velazquez contends that the "new blood" memorandum reveals a desire to hire a young applicant. Even if we could look past the fact that the "new blood" phrase was used to justify the hiring of Delgado in 1997 -- not Bruno in 2004 -- we cannot, on summary judgment, draw unreasonable inferences or accept Velazquez's bald assertion about the meaning of the phrase. Vera, 622 F.3d at 26.

First, there is nothing in the phrase "new blood," by itself, that refers to age. If anything, it is a "profoundly ambiguous" remark that is "much too innocuous to transform routine managerial decisions into something more invidious." Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 56 (1st Cir. 2000) (examining whether reference to "new blood," along with other comments, created an environment so abusive as to support constructive discharge in ADEA claim).

Second, the context of the phrase, in the 1997 memo recommending Delgado, indicates the intended meaning of the phrase.

-23-

The memo explained that the panel made its selection "based on legitimate job related reasons and the following criteria and facts: . . . Selected employee [will] [b]ring new blood to the Local Office to inject initiative and positive attitudes[.]" The phrase "new blood," then, related to the need for a new -- not necessarily younger -- employee in the Humacao office, who would bring about changes that would improve the overall performance of the office.[12]

### b. Velazquez's Qualifications

Velazquez contends that she was better qualified for the GS-9 position than Bruno. She points to her training, her educational achievements, and prior work experience as evidence that her candidacy was superior and that the only reason Bruno was selected over her was that he was younger.

There is no dispute that Velazquez was qualified for the GS-9 position. As Vargas acknowledged in her 2004 affidavit, Velazquez's application was "somewhat similar" to Bruno's, and the two had similar work experience. Vargas stated, moreover, that the candidates who were interviewed, including Velazquez, "were all highly qualified," and that the panel "could have selected anyone."

---

[12] Velazquez does argue, without pointing to any record support, that Delgado had worked at the Humacao office at some point in the past. Even so, there is no dispute that he was not working in Humacao at the time he was promoted to the Community Development Specialist position for which Velazquez had applied. Thus, he could still reasonably be considered "new blood" for the office.

Along the same lines, Gómez said that Velazquez was one of the "best qualified candidates" based on her application and written answers to some supplemental questions submitted with the application.

Nonetheless, it is clear from the record that Bruno was chosen because he had more relevant experience and performed better at his interview than Velazquez did. Bruno took courses in mortgage banking and mortgage loan origination, processing, and closing, and had also become a Certified Loan Analyst in March 2001, a Certified Loan Closer in December 2001, and was expecting his Loan Underwriter certification in December 2003. Velazquez, by contrast, had only taken a ninety-hour real estate course in 1994. Gómez stated that this disparity played some role in his decision to recommend Bruno over Velazquez: his 2004 affidavit said Velazquez "didn't have experience in the mortgage industry." Vargas also noted that Velazquez and Bruno had "similar work experience with the agency" but that Bruno was working toward finishing a loan underwriter license, a credential Velazquez did not have.[13]

---

[13] Vargas also put some weight on her misunderstanding that Bruno was working toward an MBA, rather than taking courses at the Mortgage Bankers School of Puerto Rico, abbreviated "MBS." Velazquez alleges, without record support, that Vargas willfully misrepresented Bruno's credentials. At the summary judgment stage, we will not credit this bare assertion. As the final agency decision and the Secretary suggested, it is at least as likely that Vargas, whose training was in human resources, not in finance or business, made an understandable error and merely confused the

Furthermore, Vargas and Gómez put "a lot of weight" on the interview, and Velazquez did not perform as well as Bruno did. Both interviewers commented that Velazquez's oral communication skills were not as good as Bruno's. Gómez stated that Bruno had better composure, was more sure of himself, and answered the questions more quickly and directly. The final agency decision stated that, although each candidate was afforded half an hour to advocate for his or her selection, Velazquez used only fifteen minutes. When asked what Velazquez could have done to be selected, Gómez said she would have needed to "better present her knowledge and experience during the interview." By contrast, Vargas commented that Bruno "did exceptionally well during the interview."

3. Summary

On this record, no reasonable factfinder could conclude that age was a motivating factor in the decision to promote Bruno rather than Velazquez. The 1997 memo explaining the need for "new blood" was not a reference to age, and Bruno performed better in the interview and had more experience in the mortgage industry. None of this evidence points to even a passing consideration of age, much less the use of age as a factor in the 2004 adverse employment decision.

---

acronyms "MBS" and "MBA."

## III.

For the foregoing reasons, the district court's entry of summary judgment in favor of the defendant is affirmed.

<u>So ordered</u>.